UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

MARIANA ZHAO, et al.,                    :

                    Plaintiffs,          :
                                                07 Civ. 0201 (RJS)(HBP)
     -against-                           :
                                                REPORT AND
EAST HARLEM LAUNDROMAT, INC.,            :       RECOMMENDATION

                    Defendant.           :

----------------------------------X

          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE RICHARD J. SULLIVAN, United States

District Judge,


I.   Introduction


          Plaintiffs Mariana Zhao and Martha Montalban commenced

this action for overtime wages, spread of hours wages, liquidated

damages, prejudgment interest, attorney's fees and costs under

the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq.,

the New York Minimum Wage Act, N.Y. Labor L. §§ 650 et seq., and

the "spread of hours" wage order of the New York Commissioner of

Labor, 12 N.Y.C.R.R. § 137-1.7 (2006), against defendant East

Harlem Laundromat, Inc., d/b/a 109 Street Cleaners on January 10,

2007.  Zhao has also sued for sex discrimination in violation of

the New York State Human Rights Law, N.Y. Exec. L. §§ 296 et

seq., and the New York City Human Rights Law, N.Y.C.A.C. §§ 8-101 et seq. (Complaint, dated Jan. 10, 2007, ("Compl.") (Docket Item 1) at ¶ 3).[1]

On April 1, 2009, the Honorable Richard J. Sullivan, United States District Judge, granted plaintiffs a default, as a result of defendant's failure to comply with the Court's Orders and failure to continue defending the action (Order, dated April 1, 2009 (Docket Item 63)). Judge Sullivan subsequently referred this matter to me to conduct an inquest and to issue a report and recommendation concerning the amount of damages to be awarded to plaintiffs (Order dated April 1, 2009 (Docket Item 64)).

Pursuant to the Order of Reference, I issued a Scheduling Order on May 15, 2009, directing plaintiffs to serve and file proposed findings of fact and conclusions of law by July 13, 2009, and directing defendant to submit responsive materials by August 13, 2009 (Docket Item 65). My May 15 Scheduling Order further provided:

---

[1]The plaintiffs filed an amended complaint on October 29, 2007 (("Amended Compl.") (Docket Item 15)), adding Rule 23(b)(3) class action allegations (see also Proposed Findings of Fact and Conclusions of Law ("Proposed Findings") at ¶ 2). On November 26, 2007, plaintiffs filed a motion for class certification (Docket Item 18). By an Order dated February 26, 2009, the Court granted plaintiffs' request for leave to withdraw the motion for class certification (Docket Item 61). Thus, this action is now an individual action only.

> IF DEFENDANT (1) FAILS TO RESPOND TO PLAINTIFF'S SUB-
> MISSIONS, OR (2) FAILS TO CONTACT MY CHAMBERS BY AUGUST
> 13, 2009 AND REQUEST AN IN-COURT HEARING, IT IS MY
> INTENTION TO ISSUE A REPORT AND RECOMMENDATION CONCERN-
> ING DAMAGES ON THE BASIS OF PLAINTIFF'S WRITTEN SUBMIS-
> SIONS ALONE WITHOUT AN IN-COURT HEARING. See Transat-
> lantic Marine Claims Agency, Inc. v. Ace Shipping
> Corp., 109 F.3d 105, 111 (2d Cir. 1997); Fustok v.
> ContiCommodity Services Inc., 873 F.2d 38, 40 (2d Cir.
> 1989) ("[I]t [is] not necessary for the District Court
> to hold a hearing, as long as it ensured that there was
> a basis for the damages specified in a default judg-
> ment.")

(Docket Item 65 (emphasis in original)).

One copy of my May 15 Order was sent to defendant East

Harlem Laundromat, Inc. d/b/a 109 Street Cleaners at 203 East

109th Street, New York, New York 10029, the address where the

defendant's own attorney sent correspondence before withdrawing

as counsel; a second copy of the Order was sent to Uptown Dry

Cleaners at 211 East 106th Street, New York, New York 10029, a

location at which defendant appears to have operations.  Plain-

tiffs submitted proposed findings of fact and conclusions of law

in July 2009; they made supplemental submissions on August 2,

2010.

Since its counsel withdrew, the defendant has not made

any written submission to me, nor has the defendant contacted the

Court in any way.  Since all reasonable steps to provide notice

to the defendant have been taken, I make the following findings

of fact and conclusions of law on the basis of plaintiffs'
submissions alone.

For the reasons set forth below, I respectfully recom-
mend that the court enter judgment for the plaintiffs against the
defendant as follows:  (1) $36,702.92 for Zhao, and $40,823.84
for Montalban, in lost wages and overtime; (2) $5,859.60 for
Zhao, and $7,400.40 for Montalban, in spread of hours pay; (3)
$17,505.96 for Zhao, and $23,653.99 for Montalban, in prejudgment
interest; (4)$33,615.16 for Zhao, and $29,628.20 for Montalban,
in liquidated damages; (5) no award for Zhao's discrimination
claim; (6) no award for attorney's fees, and (7) $989.44 in
costs.  The total recommended awards are $93,683.64 for Zhao, and
$101,506.43 for Montalban, for a combined total of $195,190.07.[2]

---

[2]I have departed from the plaintiffs' proposed damages
awards in numerous respects.  The reasons for these departures
include:  (1) Montalban's failure to account for the increase in
the New York minimum wage in 2006; (2) both plaintiffs' use of
three decimal places in calculations; (3) the additional accrued
interest from the time of plaintiffs' calculation on December 15,
2008, and (4) plaintiffs' incorrect reading of the law regarding
spread of hours pay.  Although I have referenced plaintiffs'
facts and figures from the Damage Computation, attached as
Exhibit C to Plaintiffs' Proposed Findings of Fact and
Conclusions of Law, I have calculated the damages to be awarded
independently.

II.  Findings of Fact

A.  The Parties

1.  Defendant East Harlem Laundromat, Inc., is a New York corporation doing business as 109 Street Cleaners, having its principal place of business at 203 East 109th Street, New York, New York 10029 (First Amended Complaint, dated Oct. 29, 2007 ("Amended Compl.") (Docket Item 15), at ¶ 4).[3]  Defendant is in the commercial laundry business.  From 2002 through 2006, the defendant generated gross annual revenues of over $500,000 each year (Amended Compl. at ¶ 4).

2.  Plaintiff Mariana Zhao was employed as a cleaning staff worker at 109 Street Cleaners in New York, New York, from approximately August 2003 to September 2006 (Amended Compl. at ¶ 6).  Plaintiff Martha Montalban was employed as a cleaning staff worker at 109 Street Cleaners from March 2002 to June 2006 (Amended Compl. at ¶ 5).  The plaintiffs' duties included button-

_____

[3]As a result of defendant's default, all the allegations of the Complaint as to it, except as to the amount of damages, must be taken as true. Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158-59 (2d Cir. 1992); Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 69-70 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363 (1973); Wing v. East River Chinese Rest., 884 F. Supp. 663, 669 (E.D.N.Y. 1995); Deshmukh v. Cook, 630 F. Supp. 956, 959 (S.D.N.Y. 1986) (Conner, D.J.).

ing and ironing shirts and packing shirts for customers (Amended Compl. at ¶¶ 8-9).  Montalban was also required to bring packages of clean shirts to a delivery truck (Affidavit of Martha Montalban, dated December 11, 2008 ("Montalban Aff."), at ¶ 2.

    B.  Employment
       Compensation and Conditions

    3.  Zhao and Montalban regularly worked over 70 hours per week, and over 12 hours per day, six days a week (Amended Compl. at ¶ 12; Montalban Aff. at ¶ 3).

    4.  The owners of defendant were Mr. Jung and Ms. Su, who paid the plaintiffs weekly in cash (Affidavit of Mariana Zhao, dated December 10, 2008 ("Zhao Aff."), at ¶ 3; Montalban Aff. at ¶ 4).

    5.  The defendant did not have its employees record their hours (Zhao Aff. at ¶¶ 3, 6; Montalban Aff. at ¶¶ 4, 7).

    6.  At the beginning of Zhao's employment, she received $240 per week (Zhao Aff. at ¶ 2).  In 2004, she began receiving $260 per week (Zhao Aff. at ¶ 2).  After July 2005, she received $270 per week (Zhao Aff. at ¶ 2).  Her salary was $300 per week for her final six months of employment (Zhao Aff. at ¶ 2).

    7.  At the beginning of Montalban's employment, she received $260 per week (Montalban Aff. at ¶ 3).  In 2003, she

began receiving $270 per week (Montalban Aff. at ¶ 3).  After March 2004, she received $280 per week (Montalban Aff. at ¶ 3). Her salary was $300 per week for her final 15 months of employment (Montalban Aff. at ¶ 3).

8.  Both plaintiffs were paid a fixed weekly rate regardless of the number of hours they worked and without regard for the federal and state minimum wage and overtime requirements (Amended Compl. at ¶ 13).

9.  The defendant processed approximately 2000 shirts per day and charged customers $1 per shirt (Zhao Aff. at ¶ 5; Montalban Aff. at ¶ 6).  The volume of shirts processed can be inferred from the fact that plaintiffs used "at least four boxes of 500 hangers each day." (Zhao Aff. at ¶ 5; Montalban Aff. at ¶ 6).  Montalban also knew the approximate number of shirts processed per day because she issued tickets for shirt orders, requiring her to count the number of shirts in each order and record them (Montalban Aff. at ¶ 6).

10.  Plaintiffs complained repeatedly to the owners and their manager (a woman named Anna) about their low salary and the number of hours worked (Zhao Aff. at ¶ 6; Montalban Aff. at ¶ 7). Defendant told Zhao that there was no extra money and told Montalban that she could be replaced and that others would work for even less (Zhao Aff. at ¶ 6; Montalban Aff. at ¶ 7).

11.   Neither plaintiff saw any posters setting forth their rights under wage and hour laws, and neither was given any information concerning these rights (Zhao Aff. at ¶ 6; Montalban Aff. at ¶ 7).

12.   In 2006, Zhao was no longer able to iron because she was pregnant with twins (Amended Compl. at ¶ 45; Zhao Aff. at ¶ 7).  She informed Jung that she was required to see her physician every two to three days (Amended Compl. at ¶ 46).  Jung and Su told her not to go to her doctor's appointments (Amended Compl. at ¶ 49).  Notwithstanding her pregnancy, Zhao was forced to do jobs involving "heavy physical labor" (Amended Compl. at ¶ 48) and was exposed to noxious chemicals (Amended Compl. at ¶ 50).

13.   In or about September 2006, Jung blamed Zhao for food that was left at work overnight (Amended Compl. at ¶ 51).  Jung pushed Zhao, and Zhao called the police.  The police officers who responded told her to quit rather than put her babies' lives in jeopardy (Amended Compl. at ¶ 51).

14.   Defendant intentionally and willfully failed to pay plaintiffs the required minimum wage, intentionally and willfully failed to pay them overtime premiums and intentionally and willfully failed to pay them an additional hour's pay for every day that their spread of hours exceeded 10 (Amended Compl.

8

at ¶¶ 31-32, 36-37, 40-41).  I infer that the defendants acted willfully by virtue of their default in this action.

III.  Conclusions of Law

    A.  Jurisdiction and Venue

    15.  This action arises under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq.  The Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331.

    16.  The Court has supplemental jurisdiction over the state-law claims asserted in the complaint pursuant to 28 U.S.C. § 1367(a).

    17.  Venue in this district is proper pursuant to 28 U.S.C. § 1391(b),(c)).

    B.  Standards
         Applicable to an Inquest

    18.  As an initial matter, defendant's default does not ipso facto establish liability on any of plaintiffs' claims. Rather, the default only establishes the truth of the well pleaded allegations of the complaint with respect to issues other than damages.  If the well-pleaded allegations of the complaint fail to state a claim, a plaintiff is not entitled to any recovery notwithstanding a defendant's default.  Trustees of the the

9

Local I.B.T. Ins. Trust Fund v. Dejana Indus., Inc., CV 08-4033
(CBA)(JO), 2010 WL 3782120 at *2 (E.D.N.Y. July 28, 2010) (Report
& Recommendation), adopted in pertinent part, 2010 WL 3747012
(E.D.N.Y. Sept. 17, 2010); Animal Science Prods., Inc. v. China
Nat'l Metals & Minerals Import & Export Corp., 596 F. Supp. 2d
842, 848-49 (D.N.J. 2008); Jackson v. Correctional Corp. of
America, 564 F. Supp. 2d 22, 26-27 (D.D.C. 2008).

        19.  In conducting an inquest following a default
judgment, "the Court must determine the proper rule for calculat-
ing damages on the claim . . . and determine whether [plain-
tiffs'] evidence sufficiently supports the damages to be deter-
mined under that rule."  Pereira v. J. Sisters Hair Care Prods.,
Inc., 08 Civ. 4537 (GBD)(RLE), 2010 WL 2194808 at *2 (S.D.N.Y.
Apr. 5, 2010) (Ellis, M.J.) (Report and Recommendation), adopted
by 2010 WL 2194807 (June 1, 2010) (Daniels, D.J.), citing TMS
Entm't Ltd. v. Madison Green Entm't Sales, Inc., 03 Civ. 0517
(GBD)(RLE), 2005 WL 2063786, at *2 (S.D.N.Y. Aug. 16, 2005)
(Ellis, M.J.) (Report and Recommendation).

        20.  Inquests into damages based solely on documentary
evidence are allowed "as long as [the Court has] ensured that
there was a basis for the damages specified in [the] default
judgment."  Cesario v. BNI Const., Inc., 07 Civ. 8545 (LLS)(GWG),

2008 WL 5210209 at *1 (S.D.N.Y. Dec. 15, 2008) (Gorenstein, M.J.)
(Report and Recommendation), adopted by 2009 WL 424136
(S.D.N.Y. Feb. 19, 2009) (Stanton, D.J.), quoting Fustok v.
ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989);
accord Transatl. Marine Claims Agency v. Ace Shipping Corp., 109
F.3d 105, 111 (2d Cir. 1997).

    C.   Wage Claims

      21.  Defendant has underpaid both plaintiffs, and
thereby violated the Fair Labor Standards Act, 29 U.S.C. §§ 201
et seq., the New York Minimum Wage Act, N.Y. Labor L. §§ 650 et
seq., and the "spread of hours" wage order of the New York
Commissioner of Labor, 12 N.Y.C.R.R. § 137-1.7 (2006).  Based on
their well-pleaded complaint, plaintiffs' wages were below the
level required by federal, state, and local statutes.

        1.  Recovery of Minimum Wage and
            Overtime under FLSA and NYLL

      22.  Pursuant to the FLSA, "an employee is entitled to
recover 'the amount of their unpaid minimum wages, [and/]or their
unpaid overtime compensation' . . . ."  Pereira v. J. Sisters
Hair Care Prods., Inc., supra, 2010 WL 2194808 at *2, quoting 29
U.S.C. § 216(b).  "To fall within the ambit of the FLSA's wage

and overtime protections, an employee must demonstrate either that [s]he was 'engaged in commerce or in the production of goods for commerce,' or that [her] employer was an 'enterprise engaged in commerce or in the production of goods for commerce.'" Chun Jie Yin v. Kim, No. 07 CV 1236 (DLI)(JO), 2008 WL 906736 at *3 (E.D.N.Y. Apr. 1, 2008), quoting 29 U.S.C. §§ 203(s)(1)(A), 207(a)(1); see also Bowrin v. Catholic Guardian Soc., 417 F. Supp. 2d 449, 457 (S.D.N.Y. 2006) (Holwell, D.J.). An "enterprise engaged in commerce or in the production of goods for commerce" exists where, among other things, its "annual gross volume of sales made or business done is not less than $500,000 . . . ." 29 U.S.C. §§ 203(s)(1)(A)(ii).

23. Here, the plaintiffs buttoned and ironed shirts and packed shirts into boxes for defendant's customers. As defendant received payment due in part to plaintiffs' work on these shirts, plaintiffs were engaged in commerce, as was their employer. Even assuming arguendo that plaintiffs were not engaged in commerce, their complaint includes allegations that the defendant's annual gross revenues were $500,000 or more for each of the years applicable for this action. Therefore, under either analysis, defendant is subject to the FLSA.

24. During the time period applicable to this action, the FLSA required a minimum wage of at least $5.15 per hour. 29

12

U.S.C. § 206 (1996).  Additionally, overtime compensation is statutorily set "for a workweek longer than forty hours . . . at a rate not less than one and one-half times the regular rate . . . ." 29 U.S.C. § 207(a)(1) (2010).  "However, if the state minimum wage is higher than the federal minimum wage, the federal overtime rate is calculated as 1.5 times the state minimum wage." Pereira v. J. Sisters Hair Care Prods., Inc., supra, 2010 WL 2194808 at *2, citing 29 C.F.R. § 778.5 (2010); see also 29 C.F.R. § 778.5 ("Where a higher minimum wage than that set in the Fair Labor Standards Act is applicable to an employee by virtue of such other legislation, the regular rate of the employee, as the term is used in the Fair Labor Standards Act, cannot be lower than such applicable minimum . . . .").  From 2002 through 2004, the New York State minimum wage was the same as the federal rate. N.Y. Labor L. § 652(1).  As of January 1, 2005, the New York State minimum wage increased to $6.00, and as of January 1, 2006, it increased to $6.75.  N.Y. Labor L. § 652(1).

25.  Zhao is seeking $36,686.10 in unpaid wages, and Montalban is seeking $39,170.67 in unpaid wages.  In computing lost wages, both plaintiffs claim to have worked 69 hours per week during the course of their employment (Damage Computation,

attached as Ex. C to Proposed Findings of Fact and Conclusions of Law ("Proposed Findings").[4]

26.   "In a FLSA case, in the absence of rebuttal by defendants, plaintiffs' recollection and estimates of hours worked are presumed to be correct." Ting Yao Lin v. Hayashi Ya II, Inc., 08 Civ. 6071 (SAS)(AJP), 2009 WL 289653 at *3 (S.D.N.Y. Jan. 30, 2009) (Peck, M.J.) (Report & Recommendation), adopted by 2009 WL 513371 (S.D.N.Y. Feb. 27, 2009) (Scheindlin, D.J.), citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946).

27.   I conclude that there is a basis for the damages specified by the plaintiffs, and that their recollections of hours worked are correct.

28.   In 2003, Zhao worked 22 weeks and was paid $240 per week.  Her hourly rate during that time was $3.48.  She should have been paid a base minimum hourly wage of $5.15 under state law.[5]  She also should have been paid overtime for the 29

---

[4]The Amended Complaint alleged that "Defendant had a policy and practice of requiring plaintiffs to work in excess of 70 hours per week.  Defendant regularly required plaintiffs to work in excess of 12 hours a day, six days a week." (Amended Compl. at ¶ 12).  However, the Amended Complaint never expressly alleged that plaintiffs worked an average of 72 hours per week. Accordingly, I take the subsequent filing that plaintiffs worked 69 hours per week as fact.

[5]Both plaintiffs are time-barred from recovering lost wages under the FLSA for the period preceding January 11, 2004, so

hours per week she worked in excess of 40 hours.  The overtime rate is one and a half times the regular rate or $7.73 per hour. Calculating the 29 overtime hours at $7.73 plus the 40 hours at $5.15 yields a sum of $430.17.  Thus, she was underpaid $190.17 for 22 weeks, or $4,183.74.

29.  In 2004, Zhao was paid $260 per week for 52 weeks, or an hourly rate of $3.77.  She should have been paid a base minimum wage of $5.15 per hour and an overtime wage of $7.73 per hour.  As a result, she should have also earned $430.17 per week in 2004, and was thus underpaid by $170.17 over those 52 weeks, for a total of $8,848.84.

30.  On January 1, 2005, the New York minimum wage was raised to $6.00 per hour.  Zhao received a raise on July 15, 2005, to $270 per week.  Thus, she was paid $260 per week for 28 weeks, or $3.77 per hour, and was then paid $270 per week for 24 weeks, or $3.91 per hour.  She should have been paid a base minimum wage of $6.00 per hour and an overtime wage of $9.00 per hour for the entire year.  Calculating the 29 overtime hours at $9.00 per hour plus the 40 hours at $6.00 per hour yields a sum of $501.00 per week that Zhao should have been paid.  Thus, she

---

recovery will be calculated pursuant to New York law.  As the minimum wage was the same under either law during that period, there is no difference between the amount of lost wages recoverable under state law and under federal law.

was underpaid $241 per week for the first 28 weeks of 2005, and she was underpaid $231 per week for the final 24 weeks.  The total underpayment for 2005 is $6,748 plus $5,544, or $12,292.

31.  On January 1, 2006, the New York minimum wage was raised to $6.75 per hour.  Zhao received a raise on March 15, 2006, to $300 per week.  Thus, she was paid $270 per week for 10 weeks, or $3.91 per hour, and was then paid $300 per week for 32 weeks, or $4.35 per hour.  She should have been paid a base minimum wage of $6.75 per hour and an overtime wage of $10.13 per hour for the entire year.  Calculating the 29 overtime hours at $10.13 plus the 40 hours at $6.75 yields a sum of $563.77 per week that Zhao should have been paid.  Thus, she was underpaid $293.77 per week for the first 10 weeks of 2006, and she was underpaid $263.77 per week for the final 32 weeks. The 2006 underpayment is $2,937.70 plus $8,440.64, or $11,378.34. Thus, her total underpayment for 2003 through 2006 is $36,702.92.

32.  Montalban worked 44 weeks in 2002 and was paid $260 per week.  Her hourly rate during that time was $3.77.  She should have been paid a base minimum wage of $5.15 under state law.  She also should have been paid overtime for the 29 hours per week she worked in excess of 40 hours.  The overtime rate is one and a half times the regular rate or $7.73 per hour.  Calcu-lating the 29 overtime hours at $7.73 plus the 40 hours at $5.15

yields a sum of $430.17.  Thus, she was underpaid $170.17 for 44 weeks, or $7,487.48.

33.  Montalban received a raise on March 16, 2003, to $270 per week.  Thus, she was paid $260 per week for 10 weeks, or $3.77 per hour, and was then paid $270 per week for 41 weeks, or $3.91 per hour.[6]  She should have been paid a base minimum wage of $5.15 per hour and an overtime wage of $7.73 per hour for the entire year.  As a result, she should have earned $430.17 per week, and was, thus, underpaid by $170.17 for the first 10 weeks of the year, and $160.17 for the final 41 weeks.  The total underpayment is $1,701.70 plus $6,566.97, or $8,268.67.

34.  Montalban received another raise on March 16, 2004, to $280 per week.  Thus, she was paid $270 per week for 10 weeks, or $3.91 per hour, and was then paid $280 per week for 41 weeks, or $4.06 per hour.  She should have been paid a base minimum wage of $5.15 per hour and an overtime wage of $7.73 per hour for the entire year.  As a result, she should have earned $430.17 per week, and was, thus, underpaid by $160.17 for the first 10 weeks of the year, and $150.17 for the final 41 weeks.

---

[6]While Zhao worked 52 weeks in the two full calendar years she worked for defendant in 2004 and 2005, Montalban only worked 51 weeks in the three full calendar years she worked from 2003-05, according to the Damage Computation, attached as Exhibit C to the Proposed Findings.

The total underpayment is $1,601.70 plus $6,156.97 or $7,758.67.

35.   On January 1, 2005, the New York minimum wage was raised to $6.00.  Montalban received a raise on March 16, 2005, to $300 per week.  Thus, she was paid $280 per week for 10 weeks, or $4.06 per hour, and was then paid $300 per week for 41 weeks, or $4.35 per hour.  She should have been paid a base minimum wage of $6.00 per hour and an overtime wage of $9.00 per hour for the entire year.  As a result, she should have earned $501.00 per week, and was thus underpaid by $221 for the first 10 weeks of the year, and $201 for the final 41 weeks.  The total underpayment is $2,210 plus $8,241, equaling $10,451.

36.   On January 1, 2006, the New York minimum wage was raised to $6.75.[7]  Montalban worked 26 weeks in 2006 and was paid $300 per week.  Her hourly rate during that time was $4.35.  She should have been paid a base minimum wage of $6.75 per hour and an overtime wage of $10.13 per hour for the entire year.  Calculating the 29 overtime hours at $10.13 plus the 40 hours at $6.75 equals $563.77 per week, the weekly wage that she should have been paid.  Thus, she was underpaid $263.77 per week for 26

---

[7]Montalban does not seek unpaid wages at this higher minimum wage in 2006, whereas Zhao did.  Both plaintiffs are legally entitled to this higher hourly rate (see Damage Computation, attached as Exhibit C to the Proposed Findings).

weeks, a total of $6,858.02.  Adding up these underpayments from 2002 through 2006, Montalban is owed $40,823.84.

    2.  "Spread of Hours" Pay

37.  New York State law requires employers to pay employees an extra hour's pay at minimum wage "in addition to the minimum wage required" for any day in which an employee works 10 or more hours.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4(a) (2010); Pereira v. J. Sisters Hair Care Prods., Inc., supra, 2010 WL 2194808 at *3; Cesario v. BNI Const., Inc., supra, 2008 WL 5210209 at *3.[8]

38.  Because both plaintiffs worked six-day weeks and 69 hours each week during their employment, or an average of 11.5 hours per day, they are also entitled to spread of hours pay for every day they worked for defendant.  Zhao worked 22 weeks in 2003, when the New York minimum wage was $5.15.  Therefore, she should have received an extra $30.90 each week, for a total of $679.80.  In 2004, Zhao worked six-day weeks for 52 weeks, and

---

[8] Plaintiffs suggest that the spread of hours pay under New York law should be paid as "an additional hour of overtime-rate pay beyond their regular pay," citing N.Y. Comp. Codes R. & Regs. tit. 12, § 137-1.7 for this proposition.  However, my reading of that provision, which reads "one hour's pay at the basic minimum hourly wage rate before allowances," means minimum wage, which is the rule under N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4(a) (2010).

should have received an extra $1,606.80 in spread of hours pay. In 2005, when the New York minimum wage was raised to $6.00, Zhao worked for 52 weeks and should have received $1,872 in spread of hours pay. And in 2006, when the New York minimum wage was raised to $6.75, Zhao should have received $1,701 in spread of hours pay for the 42 weeks she worked. Thus, Zhao is entitled to a total of $5,859.60 in spread of hours pay.

      39. Montalban worked 44 weeks in 2002, when the minimum wage was $5.15. Therefore, she should have received an extra $30.90 each week, for a total of $1,359.60. In 2003, Montalban worked for 51 weeks, and should have received an extra $1,575.90 in spread of hours pay. In 2004, she worked 51 weeks again, and should have received an additional $1,575.90 in spread of hours pay. In 2005, when the New York minimum wage was raised to $6.00, Montalban worked for 51 weeks and should have received an additional $1,836 in spread of hours pay. And in 2006, when the New York minimum wage was raised to $6.75, she should have received an additional $1,053 in spread of hours pay for the 26 weeks she worked. In total, Montalban is entitled to $7,400.40 in spread of hours pay.

3.   Liquidated Damages

40.   An employer who violates the FLSA is liable not only for lost wages and/or overtime, but also for "an additional equal amount as liquidated damages."  29 U.S.C. § 216(b) (2010). These liquidated damages "are considered compensatory rather than punitive in nature."  Cesario v. BNI Const., Inc., supra, 2008 WL 5210209 at *5, quoting Reich v. S. New England Telecomm. Corp., 121 F.3d 58, 71 (2d Cir. 1997).  The defendant "bears the burden of establishing that liquidated damages should not be awarded." Pereira v. J. Sisters Hair Care Prods., Inc., supra, 2010 WL 2194808 at *2, citing Reich v. S. New England Telecomm. Corp., supra, 121 F.3d at 71.  The defendant must establish "subjective good faith and objective reasonableness" through "plain and substantial evidence."  Cesario v. BNI Const., Inc., supra, 2008 WL 5210209 at *5, quoting Reich v. S. New England Telecomm. Corp., supra, 121 F.3d at 71 (citation and internal quotation marks omitted).  "The burden is a difficult one to meet, however, and [d]ouble damages are the norm, single damages the exception." Cesario v. BNI Const., Inc., supra, 2008 WL 5210209 at *5, quoting Brock v. Wilamowsky, 833 F.2d 11, 19 (2d Cir. 1987) (citation omitted) (internal quotation marks omitted).

41.   Likewise, the New York Labor Law also permits employees to recover as liquidated damages 25% of the total unpaid wages and spread of hours payments "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law."  N.Y. Labor L. § 663(1).

42.   Because the defendant has ceased defending this action and a default judgment has been ordered, the defendant has not carried the burden of showing that an award of liquidated damages is inappropriate.  Therefore, liquidated damages are appropriate under both federal and state law.

43.   In FLSA and New York Labor Law cases,

> The statute of limitations . . . under federal law is three years in light of Plaintiffs' uncontested factual proffers supporting the conclusion that Defendants' underpayment was willful.  29 U.S.C. § 255(a).  The statute of limitations for the state law claim is six years. N.Y. Lab. Law § 663(3).  Plaintiffs' federal claim subsumes their state law claim for the overlapping damages period.  For the period that is untimely under the federal three-year statute of limitations but timely under the state law six-year statute of limitations, the state law claim is operative.  See Khan v. IBI Armored Services, Inc., 474 F. Supp. 2d 448, 450 n.1 (E.D.N.Y. 2007).

Rios v. Neighborhood Const. Corp., No. 07 Civ. 8701 (LTS), 2009 WL 3335354, at *1 n.2 (S.D.N.Y. Oct. 14, 2009) (Swain, D.J.).

44.   Because plaintiffs did not file their complaint until January 10, 2007, they are time-barred from these double damages for all work done before January 11, 2004.  Therefore,

the liquidated damages awarded for the period prior to January 11, 2004, will be limited to the New York Labor Law rate of 25% of the unpaid wages and spread of hours.

45.   Zhao worked 23 weeks prior to January 10, 2004, and her unpaid wages for that period were $4,353.91 (she was underpaid by $190.17 for 22 of those weeks and $170.17 for one week).  Her spread of hours pay for that period of time is $710.70.  Twenty-five percent of the total of $5,064.61 equals $1,266.15, which Zhao should be awarded as liquidated damages for this period.

46.   Montalban worked 96 weeks prior to January 10, 2004, and her unpaid wages for that period were $15,916.32 (she was underpaid by $170.17 for 54 of those weeks and $160.17 for 42 weeks).  Her spread of hours pay for that period of time is $2,966.40.  Twenty-five percent of the total of $18,882.72 equals $4,720.68, which Montalban should be awarded as liquidated damages for this period.

47.   For the rest of the period, it is proper to allow plaintiffs to recover liquidated damages under the FLSA for double damages, because it will result in a higher award since "[l]iquidated damages under the FLSA are the sum of the unpaid minimum and overtime wages, based on New York's minimum wage."

Pereira v. J. Sisters Hair Care Prods., Inc., supra, 2010 WL
2194808 at *3.

48. Zhao's unpaid wages for the rest of the period for
which the FLSA applies are $32,349.01. Montalban's unpaid wages
for the rest of the period for which the FLSA applies are
$24,907.52. Adding the liquidated damages recoverable under New
York law and under the FLSA, Zhao is entitled to $33,615.16 in
liquidated damages and Montalban is entitled to $29,628.20 in
liquidated damages.

### 4. Prejudgment Interest

49. Under the FLSA, "prejudgment interest is normally
an appropriate component of a restitutionary back pay award . . .
." Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 880 (2d Cir.
1988), citing Donovan v. Sovereign Security, Ltd., 726 F.2d 55
(2d Cir. 1984). However, "[i]t is well settled that in an action
for violations of the Fair Labor Standards Act prejudgment
interest may not be awarded in addition to liquidated damages."
Brock v. Superior Care, Inc., 840 F.2d 1054, 1064 (2d Cir. 1988),
citing Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 714-16
(1945); Joiner v. City of Macon, 814 F.2d 1537, 1539 (11th Cir.
1987).

50.   In New York, prejudgment interest may be awarded pursuant to N.Y. C.P.L.R. § 5001.  Under the New York Labor Law, a successful plaintiff may be awarded both prejudgment interest and liquidated damages.  Ting Yao Lin v. Hayashi Ya II, Inc., supra, 2009 WL 289653 at *7, citing Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 265 (2d Cir. 1999); see also Yu G. Ke v. Saigon Grill, Inc., 595 F. Supp. 2d 240, 262 (S.D.N.Y. 2008) (Dolinger, M.J.) (state liquidated damages and prejudgment interest "serve fundamentally different purposes" (citation omitted) (internal quotation marks omitted)).  Even if a plain- tiff cannot recover both liquidated damages and prejudgment interest under the FLSA, she "may recover New York Labor Law prejudgment interest on overtime wages that were awarded under both the FLSA and New York State law, even where FLSA liquidated damages have also been awarded based on that amount."  Cesario v. BNI Const., Inc., supra, 2008 WL 5210209 at *6, citing Heng Chan v. Sung Yue Tung Corp., 03 Civ. 6048 (GEL), 2007 WL 1373118 at *9 (S.D.N.Y. May 8, 2007) (Lynch, D.J.).

51.   New York's statutory interest rate is 9% per year. N.Y. C.P.L.R. § 5004; Ting Yao Lin v. Hayashi Ya II, Inc., supra, 2009 WL 289653 at *7.  Where unpaid wages "were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single

25

reasonable intermediate date." N.Y. C.P.L.R. § 5001(b). Courts have frequently used the midpoint date of the period for which wages were awarded. See Cesario v. BNI Const., Inc., supra, 2008 WL 5210209 at *6; Chun Jie Yin v. Kim, supra, 2008 WL 906736 at *8. Simple interest is computed by multiplying the principal by the interest rate by the time period.

52. Zhao worked a total of 168 weeks for defendant, and Montalban worked a total of 223 weeks. Therefore, the midpoint of Zhao's employment would be at 84 weeks, and the midpoint of Montalban's employment would be 111 weeks. Zhao's prejudgment interest will be calculated from Monday, March 14, 2005, or the beginning of the 85th week of her employment. The period from that date to the date of this Report, Friday, October 8, 2010, is 4.57 Years. Montalban's prejudgment interest will be calculated from Monday, April 26, 2004, or the beginning of her 112th week. The period from that date to the date of this Report, Friday, October 8, 2010, is 5.45 Years.

53. The sum of Zhao's unpaid wages, overtime, and spread of hours pay is $42,562.52. Therefore, her prejudgment interest is $17,505.96 ($42,562.52 x 4.57 years x .09 interest rate). The sum of Montalban's unpaid wages, overtime, and spread of hours pay is $48,224.24. Therefore, her prejudgment interest is $23,653.99 ($48,224.24 x 5.45 years x .09 interest rate).

5.  <u>Summary</u>

54.  For all the foregoing reasons, Zhao should be awarded a total of $93,683.64 in wage claims, calculated as follows: (1) $36,702.92 for underpaid wages and unpaid overtime; (2) $5,859.60 for spread of hours pay; (3) $33,615.16 for liquidated damages, and (4) $17,505.96 for pre-judgment interest. Montalban should be awarded a total of $101,506.43 in wage claims, calculated as follows: (1) $40,823.84 for underpaid wages and unpaid overtime; (2) $7,400.40 for spread of hours pay; (3) $29,628.20 for liquidated damages, and (4) $23,653.99 for pre-judgment interest.

C.  <u>Zhao's Discrimination Claim</u>

55.  Zhao also asserts a discrimination claim under state and local law based on her pregnancy (Amended Compl. at ¶¶ 43-55).  Under New York State and New York City laws, it is unlawful to discriminate based on pregnancy.  N.Y. Exec. L. § 296; N.Y.C. Admin. Code § 8-107(1); <u>see</u> <u>Quaratino v. Tiffany & Co.</u>, 71 F.3d 58, 63 (2d Cir. 1995); <u>Kennebrew v. New York City Hous. Auth.</u>, 01 Civ. 1654 (JSR)(AJP), 2002 WL 265120 at *10 n.18 (S.D.N.Y. Feb. 26, 2002) (Peck, M.J.) (Report and Recommenda-

27

tion).  Zhao does not assert a claim under the federal Pregnancy
Discrimination Act.  <u>See</u> 42 U.S.C. § 2000e(k).

56.  Although the claims here are brought pursuant to
state and local laws, the Second Circuit has "repeatedly noted
that claims brought under New York State's Human Rights Law are
analytically identical to claims brought under Title VII."
<u>Torres v. Pisano</u>, 116 F.3d 625, 629 n.1 (2d Cir. 1997), <u>citing</u>
<u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 714-15 & n.6
(2d Cir. 1996). "New York courts require the same standard of
proof for claims brought under the [New York State] HRL as those
brought under Title VII," <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295,
1304 n.4 (2d Cir. 1995) (citations omitted), <u>abrogation</u> <u>recog</u>
<u>nized</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Belfi v. Prendergast</u>, 191 F.3d 129, 135
(2d Cir. 1999); <u>accord</u> <u>McNulty v. New York City Dep't of Fin.</u>,
941 F. Supp. 452, 458 (S.D.N.Y. 1996) (Sand, D.J.).  However, New
York City's Human Rights Law "is to be liberally and independently construed with the aim of making it more protective than
its federal . . . or state . . . counterparts." <u>Sicular v.</u>
<u>N.Y.C. Dep't Of Homeless Servs.</u>, 09 Civ. 0981 (AKH)(AJP), 2010 WL
423013 at *15 n.17 (S.D.N.Y. Feb. 4, 2010) (Peck, M.J.) (Report
and Recommendation), <u>adopted</u> <u>by</u> 2010 WL 2179962 (Hellerstein,
D.J.), <u>quoting</u> <u>Hanna v. N.Y. Hotel Trades Council</u>, 18 Misc.3d
436, 438 n.1, 851 N.Y.S.2d 818, 822 n.1 (Sup. Ct. N.Y. Co. 2007).

28

Since Zhao brought claims under the city human rights law in addition to the state law, the analysis must be undertaken through this more liberal, protective standard.

57. Zhao alleges that she was wrongfully terminated due to her pregnancy and that she was subjected to a hostile environment. As explained below, she has failed to state a claim under either theory.

### 1. Wrongful Termination

58. "New York courts apply the McDonnell Douglas analysis . . . to [non-environmental] discrimination claims brought under the New York State and New York City Human Rights Laws." Burger v. Litton Indus., 91 Civ. 0918, 1996 WL 421449 at *18 (S.D.N.Y. Apr. 25, 1996) (Peck, M.J.) (Report and Recommendation), adopted by 1996 WL 609421 (Knapp, D.J.) (collecting cases). In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), the United States Supreme Court set forth a three-part burden shifting analysis for discrimination claims. See Quaratino v. Tiffany & Co., supra, 71 F.3d at 64.

59. "Following the Supreme Court's directive, plaintiff must initially come forward with facts sufficient to establish a prima facie case that [she suffered an adverse employment action] under circumstances giving rise to an inference of

discrimination."  <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d 47, 52 (2d Cir. 1998).  "The burden of establishing a <u>prima</u> <u>facie</u> case is not a heavy one.  One might characterize it as minimal." <u>Carlton v. Mystic Transp. Inc.</u>, 202 F.3d 129, 134 (2d Cir. 2000); <u>see</u> <u>Galabya v. New York City Bd. of Ed.</u>, 202 F.3d 636, 639 (2d Cir. 2000); <u>Scaria v. Rubin</u>, 117 F.3d 652, 654 (2d Cir. 1997) (<u>per</u> <u>curiam</u>); <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994) (describing the burden of production as <u>de</u> <u>minimis</u>).

       60.  If a plaintiff succeeds in establishing a <u>prima</u> <u>facie</u> case of discrimination, a presumption is created "that the employer discriminated against the employee in an unlawful manner," <u>Greenway v. Buffalo Hilton Hotel</u>, <u>supra</u>, 143 F.3d at 52, and the burden then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for its actions.  <u>Carlton v. Mystic Transp., Inc.</u>, <u>supra</u>, 202 F.3d at 134; <u>Gallo v. Prudential Residential Servs. Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994); <u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435, 446 (2d Cir. 1999).

> The defendant's burden of production also is not a
> demanding one; [it] need only offer such an explanation
> for the employment decision.  Although the burden of
> production shifts to the defendant, the ultimate burden
> of persuasion remains always with the plaintiff.

<u>Bickerstaff v. Vassar Coll.</u>, <u>supra</u>, 196 F.3d at 446 (citations

omitted).

       61.   If the employer articulates a non-discriminatory reason for the termination, the presumption of discrimination raised by the prima facie case "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).  See Carlton v. Mystic Transp., Inc., supra, 202 F.3d at 134-35.  At this point, the burden shifts back to the plaintiff to offer proof that would allow a rational fact finder to conclude that the employer's proffered reason for the termination was pretextual.  St. Mary's Honor Ctr. v. Hicks, supra, 509 U.S. at 507-08; Carlton v. Mystic Transp., Inc., supra, 202 F.3d at 135. Although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explana-tion is pretextual . . . ."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (citation and internal quotation marks omitted).  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justifi-cation is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Reeves v. Sanderson Plumbing Prods., Inc., supra, 530 U.S. at 148.

62.   Because the defendant ceased defending this action
and a default judgment was ordered, the defendant has not satis-
fied his burden of production in the second step of the <u>McDonnell</u>
<u>Douglas</u> analysis.   Therefore, if plaintiff has alleged facts
sufficient fo make out a <u>prima</u> <u>facie</u> case at step one, discrimi-
nation will be shown.

63.   Zhao's amended complaint states in general terms
that she is suing "for sex discrimination" in violation of state
and local law, but, as noted above, she appears to conflate two
separate arguments into one.   She appears to allege both that
defendant discriminated against her because of her pregnancy:
(1) through a discriminatory discharge (Amended Compl. at ¶ 47
(owner "ultimately forced her to leave her job")); and by (2)
creating a hostile work environment by harassing and criticizing
her (Amended Compl. at ¶¶ 47-50 (owners "began harassing" plain-
tiff upon notice she was pregnant, giving her "heavy tasks,"
criticizing her medical appointments and subjecting her to
"noxious chemicals")).

64.   Under the analysis used in Title VII cases, an
employee

> can establish a <u>prima</u> <u>facie</u> case of pregnancy discrimi-
> nation . . . by showing that:  (1) she is a member of a
> protected class; (2) she satisfactorily performed the
> duties required by the position; (3) she was
> discharged; and (4) her position remained open and was

> ultimately filled by a non-pregnant employee.  See
> McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824;
> Burdine, 450 U.S. at 253, 101 S.Ct. at 1093-94.  Alter-
> natively, a plaintiff may satisfy the fourth require-
> ment to make out a prima facie case by showing that the
> discharge occurred in circumstances giving rise to an
> inference of unlawful discrimination.  See McDonnell
> Douglas, 411 U.S. at 802, n. 13, 93 S.Ct. at 1824 n.
> 13; Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d
> 100, 104 (2d Cir. 1989).

Quaratino v. Tiffany & Co., supra, 71 F.3d at 64.

65.  While Zhao has alleged facts sufficient to estab-

lish the first two prongs, her failure to allege facts sufficient

to establish either of the final two prongs precludes any recov-

ery for wrongful termination, notwithstanding the default judg-

ment.  The well-pleaded allegations in the complaint establish

that Zhao was a member of a protected class who satisfactorily

performed the requirements of the position.  However, her own

allegations show that she resigned and was not in fact dis-

charged.  In addition, even if her resignation could be viewed as

a constructive discharge, it did not take place under circum-

stances that give rise to an inference of pregnancy-based dis-

crimination.

66.  As to the first prong, Zhao alleges in her com-

plaint that she was pregnant in "early 2006"[9] and "was expecting

---

[9]In her affidavit, Zhao said she was pregnant in 2007 and
the incident occurred in September 2007 (Zhao Aff. at ¶¶ 7-8).
However, because the Amended Complaint states the pregnancy and

twins," and she notified both Mr. Jung and her co-workers of this fact  (Amended Compl. at ¶ 45).  As to the second prong, Zhao alleges she worked and received continuous -- albeit legally insufficient -- pay for a period from August 2003 to September 2006 (Amended Compl. at ¶¶ 6, 12-14).  Such well-pleaded facts lead to an inference that she satisfactorily performed her position's required duties.

67.  Zhao has not alleged that she was discharged. She claims "Jung began harassing her and ultimately forced her to leave her job" upon being notified of her pregnancy (Amended Compl. at ¶ 47).  However, her own pleading states that in September 2006, an altercation with Jung caused her to leave the job of her own volition.  After being shoved "from behind against a table" by Jung during a workplace argument about food having been left in the laundry overnight, Zhao called the police (Amended Compl. at ¶ 51).  The Police Officers allegedly told Zhao "not to put her babies at risk by going back to work," and that stopped working thereafter (Amended Compl. at ¶ 51).

---

the incident as occurring in 2006, and because the Damage Computation sheet that plaintiffs attached as an exhibit to the Proposed Findings only lists work dates through 2006, I assume that 2006 is the correct year and that the reference to 2007 is a typographical error.

34

68.   In addition, Zhao has not alleged facts sufficient to establish a constructive termination.  In order to sustain a finding of a constructive termination, Zhao must allege facts that show she was subjected to working conditions that were worse than a hostile environment and were "so intolerable that . . . resignation qualified as a fitting response." Pennsylvania State Police v. Suders, 542 U.S. 129, 134 (2004).  As explained below, Zhao's allegations are not sufficient to sustain a finding of a hostile environment.  A fortiori, they do not sustain a finding of a constructive discharge.  Fincher v. Depository & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010) ("Because [plaintiff] failed to establish a hostile work environment, her claim of constructive discharge also fails.").

69.   Because plaintiff does not allege facts sufficient to establish that she suffered an adverse employment action, she has not alleged the third element of a prima facie case and has failed to state a claim for wrongful discharge.

70.   Finally, Zhao has also failed to allege facts sufficient to satisfy the fourth element of a prima facie case, to wit, that the allegedly adverse employment action occurred under circumstances giving rise to an inference of discrimination.  She does not allege that either (a) her position remained open and was ultimately filled by a non-pregnant employee; or (b)

35

that the discharge occurred in circumstances giving rise to an inference of unlawful discrimination.  In fact, the Amended Complaint alleges that the final altercation with Jung was the product of Jung's belief that Zhao left food out in the laundry overnight.  These fact strongly suggest that if Zhao was discharged, it was not because she was pregnant.

71.  Thus, defendant is not liable on Zhao's wrongful termination claim notwithstanding its default.

2.  Hostile Environment Claim

72.  To state a hostile work environment claim, a plaintiff must allege that the defendant's behavior was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." Kennebrew v. New York City Housing Auth., 01 Civ. 1654 (JSR)(AJP), 2002 WL 265120 at *11 (S.D.N.Y. Feb. 26, 2002) (Peck, M.J.)(Report and Recommendation).

> A hostile work environment claim requires a showing [1] that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and [2] that a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (internal citations and quotation marks omitted). The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were

thereby altered.  <u>Leibovitz v. N.Y. City Transit Auth.</u>,
252 F.3d 179, 188 (2d Cir. 2001) (citing <u>Meritor Sav.</u>
<u>Bank, FSB v. Vinson</u>, 477 U.S. 57, 67, 106 S.Ct. 2399,
91 L.Ed.2d 49 (1986)); <u>Brennan v. Metro. Opera Ass'n,</u>
<u>Inc.</u>, 192 F.3d 310, 318 (2d Cir. 1999).  This test has
objective and subjective elements:  the misconduct
shown must be "severe or pervasive enough to create an
objectively hostile or abusive work environment," and
the victim must also subjectively perceive that envi-
ronment to be abusive.  <u>Harris v. Forklift Sys., Inc.</u>,
510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
As a general rule, incidents must be more than "epi-
sodic; they must be sufficiently continuous and con-
certed in order to be deemed pervasive."  <u>Perry</u>, 115
F.3d at 149 (citation and internal quotation marks
omitted).  Isolated acts, unless very serious, do not
meet the threshold of severity or pervasiveness.
<u>Brennan</u>, 192 F.3d at 318; <u>see</u> <u>also</u> <u>Faragher v. City of</u>
<u>Boca Raton</u>, 524 U.S. 775, 788, 118 S.Ct. 2275, 141
L.Ed.2d 662 (1998) (noting that "[w]e have made it
clear that conduct must be extreme to amount to a
change in the terms and conditions of employment").
But it is well settled in this Circuit that even a
single act can meet the threshold if, by itself, it can
and does work a transformation of the plaintiff's
workplace.  <u>See</u>, <u>e.g.</u>, <u>Howley v. Town of Stratford</u>, 217
F.3d 141, 154 (2d Cir. 2000) (vile and sexually ex-
plicit verbal abuse of a female firefighter that chal-
lenged her competence, was witnessed by a large group
that included her subordinates, and created a justified
fear that she would be left in peril at fire scenes);
<u>Richardson v. N.Y. State Dep't of Corr. Serv.</u>, 180 F.3d
426, 437 (2d Cir. 1999) (observing that a single sexual
assault may be sufficient to alter the terms and condi-
tions of the victim's employment).

     In short, a plaintiff alleging a hostile work
environment "must demonstrate either that a single
incident was extraordinarily severe, or that a series
of incidents were 'sufficiently continuous and con-
certed' to have altered the conditions of her working
environment."  <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d
560, 570 (2d Cir. 2000) (quoting <u>Perry</u>, 115 F.3d at
149).  To decide whether the threshold has been
reached, courts examine the case-specific circumstances

> in their totality and evaluate the severity, frequency, and degree of the abuse.  Harris, 510 U.S. at 23, 114 S.Ct. 367 (relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance"); see also Cruz, 202 F.3d at 570.

Alfano v. Costello, 294 F.3d 365, 373-74 (2d Cir. 2002) (brackets in original); see also Pa. State Police v. Suders, 542 U.S. 129, 133-34 (2004); Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001); Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007); Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 (2d Cir. 2006); Petrosino v. Bell Atlantic, 385 F.3d 210, 221-22 (2d Cir. 2004); Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004); 366 F.3d 138, 150 (2d Cir. 2004); Feingold v. New York, 366 F.3d 138, 157- 58 (2d Cir. 2004) Hayut v. State Univ. of N.Y., supra, 352 F.3d 733, 744-45 (2d Cir. 2003); Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000).

　　　73.  A hostile environment claim requires offensive conduct that is severe and pervasive; the offensive conduct need not, however, be intolerable or unendurable.

> While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that "[w]hile a mild, isolated incident does not make a work environment hostile, the test is whether 'the harassment is of such quality or quantity that a

38

reasonable employee would find the conditions of
her employment altered for the worse.'" (alter-
ation and emphasis in the original).

　　　　　Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)
(quoting Whidbee v. Garzarelli Food Specialties, Inc.,
223 F.3d 62, 70 (2d Cir. 2000)).  "The environment need
not be 'unendurable' or 'intolerable.'"  Id.  In brief,
"the fact that the law requires harassment to be severe
or pervasive before it can be actionable does not mean
that employers are free from liability in all but the
most egregious cases."  Id. (quoting Whidbee, 223 F.3d
at 70 (internal quotation marks omitted)).

Feingold v. New York, supra, 366 F.3d at 150.

　　　　74.  In determining whether the level of workplace

misconduct constitutes an actionable "hostile environment," no

single factor is determinative; rather, the court must consider

the totality of the circumstances.  Faragher v. City of Boca

Raton, 524 U.S. 775, 787-88 (1998); Raniola v. Bratton, 243 F.3d

610, 617 (2d Cir. 2001); Cruz v. Coach Stores, Inc., supra, 202

F.3d at 570.  See also Hayut v. State Univ. of N.Y., supra, 352

F.3d at 746 (hostile environment claims are "fact-specific and

circumstance-driven").

　　　　　75.  "Factors that a court might consider in assessing

the totality of the circumstances include:  (1) the frequency of

the conduct; (2) its severity; (3) whether it is threatening and

humiliating, or a mere offensive utterance; and (4) 'whether it

unreasonably interferes with the performance of an employee's

work performance.'"  Patane v. Clark, 508 F.3d 106, 113 (2d Cir.

39

2007), quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

76.   Following the Supreme Court's decision in Swierkiewicz v. Sorema, 534 U.S. 506, 512 (2002), courts in this Circuit have applied the liberal notice pleading standard to hostile work environment claims.  E.g., Salerno v. City University of N.Y., 99 Civ. 11151 (NRB), 2002 WL 31856953 at *3 (S.D.N.Y. Dec. 19, 2002).  However, "[e]ven after Swierkiewicz, courts have dismissed hostile work environment claims at the pleadings stage where . . . the alleged conduct was not severe or pervasive enough to warrant relief."  Prince v. Cablevision Sys. Corp., 04 Civ. 8151 (RWS), 2005 WL 1060373 at *8 (S.D.N.Y. May 6, 2005).

77.   Relatively few cases have addressed a pregnancy-based hostile work environment claim.[10]  A brief review of the these cases is helpful to assess whether the conduct alleged here is sufficient to state a claim.

78.   In Gorski v. New Hampshire Dep't of Corr., 290 F.3d 466 (1st Cir. 2002), the First Circuit held that the following allegations were sufficient to sustain a female corrections

_____

[10]Plaintiffs have submitted no authorities addressing the sufficiency of Zhao's hostile work environment claim.

officer's claim that she had been subjected to a pregnancy-based
hostile work environment:

> a.  when he first learned plaintiff was pregnant,
> plaintiff's supervisor "oh Tara, why did you have to do
> that?  Why did you get pregnant, with everything going
> on, why do you want another child?"

> b.  a second supervisor said to plaintiff "oh
> great, we're going to have to deal with that now;"

> c.  after learning of plaintiff's pregnancy, when
> plaintiff complained about her workload, which had been
> an issue even before her pregnancy, a supervisor and
> others responded with comments like "she's just preg-
> nant," "you're only complaining now because you're
> pregnant," and "it's your hormones;"

> d.  during this same time period, plaintiff was
> denied transfer out of her unit, because, her supervi-
> sor was concerned that she would not return after her
> child was born;

> e.  in response to her request for a transfer,
> plaintiff's supervisor stated, "no one is going to want
> you because you are pregnant and you are going to have
> to wait until after you are back;"

f.  while on an approved stress leave a supervisor
called plaintiff and asked if she could come in for one
day to show a co-worker what to do with a project that
plaintiff knew well, knowing that such attendance would
be contrary to the advise of plaintiff's physician, and

g.  a supervisor went to plaintiff's residence
while plaintiff was on leave and pressured plaintiff to
return to work, asking "why aren't you at work, what's
your problem?" at a time when plaintiff's physician had
advised her not to work.

290 F.3d 469 at n.1.

79.  In Walsh v. Nat'l Computer Sys., Inc., the Court
of Appeals affirmed a verdict for plaintiff in an action alleging
a  pregnancy-based hostile work environment.  In that case
plaintiff had returned to work after having a baby and was
subjected to a number of comments and instances of disparate
treatment after she returned to work.  Specifically, she was
required to give advance notice of medical appointments which
other employees were not required to do, was admonished to stop
disrupting the office when she showed co-workers pictures of her
son, was denied certain benefits that other employees received,
was admonished for trifling conduct that other employees were
freely permitted to engage in, was denied a minor alteration in

42

her schedule that was requested for child-care needs with the comment that maybe she should look for another job, and a supervisor referred to plaintiff's infant son as "the sickling." Plaintiff was also told that she would have to make up "every minute" she was out to address child care needs when no other employees were subjected to this requirement. After plaintiff had had to leave work early on several occasions to take her son to a physician, a supervisor threw a telephone directory at plaintiff and told her to find a pediatrician who was open after hours. Plaintiff was also told that she "'better not be pregnant again'" after fainting at work. 332 F.3d 1150, 1155 (8th Cir. 2003).

80. And in <u>Panzarino v. Deloitte & Touche LLP</u>, 05 Civ. 8502 (BSJ)(RLE), 2009 WL 3539685 (S.D.N.Y. Oct. 29, 2009), the Honorable Barbara S. Jones, United States District Judge, granted defendant's motion for summary judgment in a pregnancy based hostile environment case in which plaintiff's supervisor commented frequently on the number of pregnancies in plaintiff's group, made disparaging comments about pregnant employees in group meetings, described pregnant employees as "'knocked up'" or "'about to pop,'" and expressed a belief that it was necessary to hire more men because so many women were on maternity leave. 2009 WL 3539685 at *3.

43

81.   Although it is a close case, I conclude that Zhao has not stated a claim for a hostile work environment under the more liberal New York City Human Rights Law standard.   This determination is particularly difficult because Zhao's work environment was arduous and unpleasant.   Because of the generally undesirable and illegal working conditions under which employees allegedly worked over 70 hours per week, six days a week, for illegally low pay (and with only a combined 40 minutes in breaks per day (see Zhao Aff. at ¶ 4), it is difficult to determine whether Zhao's pregnancy was a factor contributing to the manner in which her employer treated her or whether her treatment was merely her employer's standard operating procedure.

82.   Notwithstanding defendant's unpleasant treatment of her, Zhao admits that she was reassigned from ironing duty upon notifying her superiors of her pregnancy (Amended Compl. at ¶ 48).   This suggests that, contrary to Zhao's allegations, defendant was not creating a hostile work environment but rather attempting to accommodate her pregnancy.   This conclusion is buttressed by the fact that Zhao admits that "I was not able to iron shirts because I was pregnant" and that her new job description was to button shirts, a task which seems to be less physically demanding (Zhao Aff. at ¶ 7; Amended Compl. at ¶ 48).

83.   Nevertheless, Zhao alleges that one of the jobs to which she was assigned after being taken off ironing -- splitting up the shirts (which I assume means breaking up shirts that are bundled together) -- involved "heavy physical labor" and suggests that this was hostile and discriminatory (Amended Compl. at ¶ 48).   I conclude that this allegation does not rise to the level of a hostile work environment.

84.   Zhao's being occasionally assigned to break apart bundled shirts appears to be nothing more than a common division of labor, and certainly not intimidating, hostile or offensive. Given the nature of a company processing 2000 shirts per day, it is inevitable that employees will be assigned to separate bundled garments.

85.   It appears to me that defendant attempted to accommodate Zhao's pregnancy by reassigning her to the job of buttoning shirts and the job of breaking bundled shirts apart and was not an intimidating, hostile, or offensive gesture.  Although the record is sparse on the issue, it appears that manual labor was an inherent feature of Zhao's employment and that any re-assignment would necessarily involve manual labor.  Given Zhao's previous assignment of ironing and packing (see Zhao Aff. at ¶ 1), Zhao's reassignment appears to be reasonable and does not give rise to an inference of hostility or ill will.

86.  Next, Zhao alleges she was "forced . . . to be
exposed to noxious chemicals" (Amended Compl. at ¶ 48), and in
her affidavit identifies some of these chemicals as "Tide, large
boxes of starch, and ammonia in gallon containers" (Zhao Aff. at
¶ 5).  Although working around these substances was, no doubt,
unpleasant, exposure to these chemicals seems inevitable for a
laundry worker.  Moreover, Zhao does not allege that the level of
her exposure to these chemicals changed after she disclosed her
pregnancy or that she was singled out to work with these sub-
stances.  Thus, I conclude that Zhao's exposure to these sub-
stances does not support a hostile work environment claim.

87.  The final components of Zhao's hostile environment
claim are her allegations that defendant repeatedly told her that
she did not need to go to her doctor every two to three days and
that she should not do so.  Zhao does not allege, however, that
she was ever disciplined for going to the doctor nor does she
allege that she was ever denied permission to go to the doctor.
Although defendant had no business trying to regulate Zhao's
visit to her doctor and defendant's doing so was, no doubt,
offensive, I conclude that it does not rise to the level of
severity to constitute a hostile work environment.  As the cases
cited above demonstrate, not all crude, ill-mannered or inappro-
priate conduct will support a hostile environment claim.

46

Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68

(2006), citing Oncale v. Sundowner Offshore Servs., Inc., 523

U.S. 75, 80 (1998) ("Title VII, we have said, does not set forth

'a general civility code for the American workplace.'").  Defen-

dant's comments on plaintiff's medical treatment were inappropri-

ate and unwarranted, but I conclude that they are not suffi-

ciently severe or intimidating to sustain a finding of a hostile

environment.

        88.  Because I conclude that Zhao's allegations do not

support her claim of pregnancy discrimination, it is unnecessary

to address her damages allegations concerning this claim.

        C.  Attorney's Fees
            and Costs

        89.  Under the FLSA, a court "shall, in addition to any

judgment awarded to the plaintiff or plaintiffs, allow a reason-

able attorney's fee to be paid by the defendant, and costs of the

action."  29 U.S.C. § 216(b); see Cesario v. BNI Const., Inc.,

supra, 2008 WL 5210209 at *6.  New York Labor Law also provides a

successful plaintiff with attorney's fees and costs.  N.Y. Labor

L. §§ 198, 663(1).  However, in applying for these attorney's

fees and costs, "any attorney . . . must document the application

with contemporaneous time records.  These records should specify,

for each attorney, the date, the hours expended, and the nature
of the work done." New York State Ass'n for Retarded Children,
Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983).  Transcrip-
tions of contemporaneous time records containing the above
information have been found to satisfy this requirement. See,
e.g., Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers,
34 F.3d 1148, 1160 (2d Cir. 1994) (accepting a "typed listing of
[attorneys'] hours from their computer records," in lieu of
contemporaneous records, where the record showed that the attor-
neys "made contemporaneous entries as the work was completed, and
that their billing was based on these contemporaneous records");
Johnson v. Kay, 742 F. Supp. 822, 837 (S.D.N.Y. 1990) (Sweet,
D.J.) ("Where the attorneys have provided the court with affida-
vits that have been reconstructed from contemporaneous records
and that set forth all charges with specificity, fees have not
been denied."); Lenihan v. City of New York, 640 F. Supp. 822,
824 (S.D.N.Y. 1986) (Conner, D.J.) ("The Court routinely receives
computerized transcriptions of contemporaneous time records from
firms whose billing records are maintained in computers" as "a
form convenient for the Court.").  "Attorneys' fees applications
that do not contain such supporting data[, however,] 'should
normally be disallowed.'" Cablevision Sys. N.Y. City Corp. v.
Diaz, 01 Civ. 4340 (GEL)(FM), 2002 WL 31045855 at *5 (S.D.N.Y.

48

July 10, 2002) (Maas, M.J.) (Report and Recommendation), quoting
N.Y. State Ass'n for Retarded Children, Inc. v. Carey, supra, 711
F.2d at 1154, and citing Kingvision Pay-Per-View v. The Body
Shop, 00 Civ. 1089 (LTS), 2002 WL 393091 at *5 (S.D.N.Y. Mar. 13,
2002) (Swain, D.J.).

      90.  Here, plaintiffs have not submitted contemporane-
ous time records.  Instead, plaintiffs' counsel has submitted one
short paragraph in the Proposed Findings stating -- without
further support -- that these fees and costs may be allowed.  In
a one-page exhibit attached to that submission, counsel merely
lists four attorneys, their hours, rates and the total amount
due.  There are no dates listed or explanations of the work
provided to plaintiffs.  No evidence is submitted to demonstrate
that the hourly rates sought are reasonable.  Plaintiffs' papers
provide no indication that the summary of hours expended was
produced based on a compilation of contemporaneous time records.
As such, this lack of contemporaneous time records makes it
impossible for the court to make an evaluation of whether attor-
ney's fees are reasonable here.  Accordingly, I respectfully
recommend that plaintiff not be awarded attorneys' fees in this
action.

91.   Plaintiffs' costs do not require the same level of documentation, and I shall permit plaintiff to recover costs in the amount of $989.44.[11]

## IV.   Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that the court award $93,683.64 to Zhao, and $101,506.43 to Montalban, that no attorney's fees be awarded and that costs in the amount of $989.44 be awarded.

## V.   Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c)) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  See also Fed. R. Civ. P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Richard J. Sullivan, United States District Judge, 500 Pearl Street, Room 640, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests

---

[11]Plaintiffs' costs are (1) a filing fee of $350.00; (2) process service fees of $66.00; (3) PACER costs totaling $11.44 and (5) document translation of $562.00 for a total of $989.44.

for an extension of time for filing objections must be directed
to Judge Sullivan.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS
**WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE
REVIEW.   Thomas v. Arn, 474 U.S. 140, 155 (1985); United States
v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO
Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank
v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair
Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714
F.2d 234, 237-238 (2d Cir. 1983).

Dated:   New York, New York
         October 8, 2010

                                    Respectfully submitted,


                                    HENRY PITMAN
                                    United States Magistrate Judge

Copies mailed to:

Michael A. Faillace
Michael Faillace & Associates, P.C.
32nd Floor
110 East 59th Street
New York, New York 10022

East Harlem Laundromat, Inc.
d/b/a 109 Street Cleaners
203 East 109th Street
New York, New York 10029

Uptown Dry Cleaners
211 East 106th Street
New York, New York 10029

51